## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

In re:

Damian Richard Brant,                                    No.  3:23-bk-30093-SHB

               Debtor.                          Chapter 7

_____

Davey and Kimberly Sanderson,

               Plaintiffs,
                                                         Adv. Proc. No.
   vs.

Damian Richard Brant,

               Defendant.

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND DENIAL OF DISCHARGE

The complaint of Davey and Kimberly Sanderson, respectfully alleges:

1.      That the Plaintiffs are creditors of Defendant Debtor, and hold a claim against Defendant Debtor.

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157, and this proceeding is a core proceeding.

3.      Venue is proper in this Court pursuant to 28 U.S.C. §1409 as arising in the Chapter 7 case of Damian Richard Brant (hereinafter "Debtor"), Case No. 23-30093-SHB, pending in the Eastern District of Tennessee.

4.      That Defendant is the Debtor in the above titled case and filed a petition under Chapter 7 of the Bankruptcy Code on February 14, 2023.

5.      This proceeding is initiated pursuant to Rule 7001(6) of the Federal Rules of Bankruptcy Procedure.

6.      The Defendant, Damian Richard Brant, may be served pursuant to Federal Rule of Bankruptcy Procedure 7004(b)(1) via first class mail to:

> Damian Richard Brant
> 1625 Capitol Blvd.
>  Knoxville, TN, 37931

And upon his attorney pursuant to Fed. R. Bankr. P. 7004(g) to:

> John P. Newton, Jr.
> Law Offices of Mayer & Newton
> 8351 E. Walker Springs Lane
> Suite 100
> Knoxville, TN 37923

<u>BACKGROUND</u>

7.      Davey and Kimberly Sanderson are citizens and residents of 712 Iva Lane, Knoxville, Knox County, Tennessee, 37918 (the "Residence").

8.      The Debtor, Damian Richard Brant, is the sole shareholder of Dynamic Trade, Inc., ("Dynamic"), is the alter ego of Dynamic, is an officer or principal agent of Dynamic, and all times material to Plaintiffs' claims is responsible for holding himself and Dynamic out as a licensed home improvement contractor or contractor.

9.      The Plaintiffs hired Dynamic/Debtor to repair damage to their residence as a result of a sewer back up.  The parties entered into a written contract on February 25, 2022 (the "Contract").  A copy of the Contract is attached herein as Exhibit A and incorporated herein by reference.

10.     The Plaintiffs chose the Debtor based on his website www.dynamictrade.com where he advertised his services as a licensed contractor.

11.     The Debtor visited the residence of the Plaintiffs in January 2022 to assess the damage and offer an estimate for repairs. During this meeting, the Debtor held himself out to be a licensed contractor capable and qualified to make the repairs to the residence.

12.     Prior to Debtor's arrival at the residence, the Plaintiffs had removed their belongings to storage and retained Puro Clean to begin clearing carpet and other materials damaged from the sewage backup.

13.     After visiting the residence, the Debtor provided the Sandersons with estimate #1003 which estimated the cost to repair the damage at the Residence was $21,300.00.

14.     The Contract price for repairs was $23,050.00 which was $1,750.00 higher than the estimate due to price increase for an upgrade in flooring from carpet to laminate flooring.

15.     Although the Contract identifies Dynamic as a contractor with license number 9637 in the first introductory paragraph of the Contract, the Contract is only signed by the Debtor in his individual capacity.

16.     Upon information and belief, neither Dynamic nor the Debtor are licensed home improvement contractors, nor are they licensed contractors.

17.     Upon information and belief, the contractor license number 9367 does not belong to the Debtor or Dynamic.

18.     The Debtor began work on the Residence on February 25, 2022 and under the terms of the Contract, the Sandersons paid the Debtor the initial payment of $6,525.00.

19.     Three days later on February 28, 2022, the Sandersons paid the Debtor an additional $2,163.00 from funds received from their insurance company.

20.     On or about March 2, 2022, the Debtor sent the Sandersons an estimate for an additional $8,650.00 of work he claimed was not in the original contract.

21.     The Sandersons neither agreed to the services contained in the March 2 estimate nor did they sign any agreement amending the Contract to include additional work described in the March 2 estimate.

22.     The Sandersons paid the Debtor an additional $750.00 on or about March 15, 2022, and $2,750.00 on March 17, 2022, and $3,800.00 on March 18, 2022, all in response to invoices they received.

23.     Per the terms of the Contract, the Sandersons were to pay the Debtor $7,600.00 upon completion of half of the work, but less than half had been completed by March 18, 2022.  The total amount paid by this point was $15,988.00 which represents 69% of the total contract price yet less than half of the work had been completed.

24.     On March 31, 2022, the Debtor notified the Sandersons all of the work under the contract had been completed.

25.     One day later, the Debtor sent the Sandersons yet another estimate (the "April 1 Estimate") stating additional contracting services totaling $6,788.94 were needed and should have been included in the Contract price.  By this April 1 Estimate, the Debtor had demanded a total to be paid of $38,488.94.

26.     The Sandersons never agreed to the addition of the contracting services outlined in the April 1 Estimate beyond which they had already agreed to in the Contract nor did they sign an amendment to the Contract agreeing to pay for the services described in the April 1 Estimate or any Estimates subsequent to the initial contract.

27.     On April 3, 2022, the Sandersons notified the Debtor in writing that the work he performed was not performed in a workmanlike manner, was of exceptionally poor quality, and was not as agreed.

28.     Very soon after sending the Debtor a writing with their concerns, the Sandersons learned that the contractor's license number he was using did not belong to him.  The number belonged to Joshua Nelson.  The Sandersons contacted Mr. Nelson who admitted he was aware the Debtor used his contractor's license and approved the Debtor to use it.

29.     Based on recommendation of Mr. Nelson, he suggested the Sandersons make a detailed list of the issues and send it to him and he would make sure the Debtor received it.  He told the Sandersons they worked together.

30.     The Debtor refused to perform any repairs and sent a demand letter to the Sandersons for an additional $18,762.00.

31.     On or about April 9, 2022, the homeowners' insurance carrier performed an inspection of the repairs and determined the Sanderson's repairs failed, allowing the insurance carrier to refuse to advance any further insurance monies.

32.    As a result of the failed inspection and failure to receive insurance monies, the Sandersons had to move back into an unfinished home and move their household goods from storage back into the home.

33.    On or about May 25, 2022, the Sandersons received an estimate to repair the work the Debtor had completed and to finish the incomplete work in an amount of $21,115.00.

34.    On or about December 5, 2022, the Sandersons filed the attached Complaint (the "Complaint") in Knox County Circuit Court.  A copy of the Complaint is attached herein as Exhibit B and incorporated herein by reference.

## COUNT ONE - NONDISCHARGEABILITY UNDER 11 U.S.C. §523(a)(2)

35.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 34 above, as if fully set forth herein.

36.    Section 523(a)(2)(A) provides an exception from discharge as to debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-(A) false pretenses, a false representation, or actual fraud..."

37.    Debtor represented to the Sandersons that he was an experienced contractor, able to perform the repairs to their home after damage caused by a sewage back up.

38.    Debtor held himself out as a licensed contractor who had the credentials and knowledge to make the repairs.

39.    These representations were material and the Sandersons relied on the representations in forming the Contract with the Debtor.

40.    Upon information and belief, at the time of the contract formation, Debtor knew that he was operating under a false contractor's license.

41.    Debtor's actions in looking at the project and accepting it with knowledge he was using a false contractor's license reflects an intent to defraud the Sandersons.

42.    The Sandersons relied on Debtor's representations in paying invoices with the insurance money.

43.    The Sandersons have suffered a loss by relying on the Debtor's misrepresentations, namely:

1)    $15,988.00 paid to Debtor for the defective work; and

2)    $21,115.00 the estimate it will cost to correct the defective work and complete the unfinished work.

## COUNT TWO - NONDISCHARGEABILITY UNDER 11 U.S.C.§523(a)(4)

44.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 43 above, as if fully set forth herein.

45.    Section 523(a)(4) provides an exception from discharge as to debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."

46.    The debt owed to the Sandersons was incurred by defalcation while the Debtor was acting in a fiduciary capacity.  There was a pre-existing fiduciary relationship that the Debtor breached which resulted in a loss to the Sandersons.

47.    The Debtor falsely held himself out to be a licensed contractor who could repair the sewer back damage.  Based on these representations, the Sandersons entered into a written contract with him for the repairs and paid him some $15,988.00 from insurance proceeds that the Debtor spent but did not properly or fully complete the repairs and cannot account for where this money was spent.

## COUNT THREE - NONDICHARGEABILITY UNDER 11 U.S.C.§523(a)(6)

48.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 47 above, as if fully set forth herein.

49.    Section 523(a)(6) provides an exception from discharge as to debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."

50. The Debtor's workmanship on the repairs is so poor that it will take an additional $21,115.00 to correct the poorly complete repairs and to finish the unfinished repairs. This is a willful violation of the terms of the Contract.

51. Because the workmanship is so poor and the Debtor accepted funds for work he knew he could not do, this reflects on an intent to intentionally injure the Sandersons.

52. Because the Debtor accepted the insurance money and performed the work so poorly, this demonstrates a conscious disregard of his duties owed under the Contract and rise to the level of willfulness.

## COUNT FOUR - DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C.§727(a)(3)

53. Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 52 above, as if fully set forth herein.

54. The Court may deny the discharge of a debtor under Section 727 (a)(3) if a debtor has "...failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."

55. The Debtor has not accounted for the money the Sandersons have paid him and the work was not only poorly done but not fully completed.

## COUNT FIVE - ATTORNEY FEES

56. Plaintiffs incorporate each and every allegation contained in paragraphs 1 through 55 above, as if fully set forth herein.

57. The Sandersons have incurred attorney fees and expenses to prosecute a case against the Debtor in Knox County Circuit Court and now have expended monies for attorney representation in this matter.

58. The Debtor operated as a licensed contractor in violation of Tennessee Code Annotated §62-6-103 because he said he was a licensed contractor but he was not.

WHEREFORE, Plaintiffs respectfully request this Court enter an Order and Judgment against Defendant as follows:

1) That, pursuant to Counts I, II, and/or III, the debt owed by the Debtor to the Sandersons with attorney fees and all costs of Court, be determined non-dischargeable pursuant to 11 U.S.C. §§ 523 (a)(2), (a)(4) and/or (a)(6) and accruing post-judgment interest at the statutory rate;

2) That, pursuant to Count IV, the Debtor Damian Brant, is denied discharge of his debts pursuant to 11 U.S.C. §727(a)(3);

3) That the Court grant the Sandersons their attorney fees and costs of litigation with same being held non-dischargeable in bankruptcy and, as such, excepted from discharge; and

4) Providing for such other and further relief as this Court deems just and proper.

Respectfully submitted this the 26th day of May, 2023.

s/Hannah Tippett
s/Heather Ellis Banks_____
Hannah Tippett, #028287
Heather Ellis Banks, #023493
Attorneys for Plaintiffs
Mostoller, Stulberg, Whitfield, Allen & Tippett
136 S. Illinois Ave., Suite 104
Oak Ridge, TN 37830
(865) 482-4466

This agreement is made on the 25th day of Feb, 2022 between *[Dynamic Trade Inc]*, of *[1625 Capitol Blvd]*, City of *[Knoxville]*, County of *[Knox]*, State of Tennessee referred to below as contractor, license number *[[9367]* and *[Davey Sanderson]*, of*[712 Iva Ln]*, City of *[Knoxville]*, County of *[Knox]*, State of Tennessee referred to below as Homeowner/contracting party.

### Section I. Description of Work

Contractor agrees to provide all the materials and to perform the following described work, at *[712 Iva Ln]*, shown on the Estimate and described in the accompanying specifications prepared by *[Dynamic Trade Inc]* and to do everything required by the general conditions of the contract, the specifications and drawings.

- Flooring install - Includes purchase and install of flooring + baseboard + quarter round
- Demo - Demo and Dumping of all current flooring and tack strips from carpet (1400 SqFt)
- Sub floor install - Includes removal and replacing of all water damaged ply and particle sub floor
- Toilet install - Includes purchase and installation of 2 toilets
- Bath tub install - Includes purchase and install of 1 bath tub + shower
- Vanity install - Includes purchase and install of 1 vanity + sink
- Dry wall install - Includes purchase and install of all missing drywall. Also includes mudding and sanding. Also includes prime + paint of new drywall
- Insulation install - Includes purchase and install of R-13 2"x4" wall insulation for exterior wall in bathroom
- Trim install - Includes purchase and install of bathroom door trim and base trim
- Flooring upgrade - Difference of cost covered by insurance for carpet and customer requested LVP

### Section II. Alterations

Any alterations or modifications initiated by the homeowner/contracting party or contractor must be agreed upon between the parties and the price fixed by them before work on such an alteration or modification shall commence. Payment for such alteration or modification shall be made at the time of the final completion of the work.

### Section IV. Contract Time

# EXHIBIT A

The work shall commence not later than *[02/28/2022]*, and shall be completed within *[90]* calendar days thereafter. Contractor shall not be liable for any delay or nonperformance caused by an act of God, strikes, unavailability of materials, or any other contingency beyond its control.

## Section V. Cancellation

This contract may be canceled by homeowner/contracting party within *[7]* business days following the date of the execution of this agreement by giving written notice of rescission to the contractor at the address given in this contract, in which event owner shall be entitled to a complete refund of the down payment given to contractor at the time of the execution of this agreement. After such period, but before the actual commencement of work by the contractor, homeowner/contracting party may cancel this agreement, in which event homeowner/contracting party shall forfeit to contractor the down payment given at the time of the execution of this agreement. In the event owner cancels this agreement after the contractor has commenced the work, homeowner/contracting party shall forfeit the amount of the down payment given to contractor at the time of the execution of this agreement, and in addition, shall pay to the contractor such proportion of the total contract price as the amount of labor and materials furnished bears to the total amount of labor and materials agreed upon to be furnished under this agreement, the same to be paid within *[14]* days from the date of cancellation. In the event the contractor is unable to complete the performance of its obligation under this contract due to acts of God, strikes, unavailability of supplies or material, or any other contingency beyond its control, owner may at its option cancel this contract. In such an event, homeowner/contracting party shall only be liable to pay contractor the amount of labor and material already furnished. Payment is to be made within *[14]* days after the date of such cancellation. In the event the homeowner's/contracting party's home is destroyed by fire, earthquake, or any other cause not attributable to the homeowner/contracting party, this contract shall automatically be canceled with the parties having no further obligation to each other, and the down payment given by the owner at the time of the execution of this agreement shall be retained by the contractor.

*Contractor's Termination.* The contractor may, on *[one week's]* written notice to the homeowner/contracting party, terminate this contract before the termination date when for a period of 30 days after a progress payment is due, through no fault of the contractor, the homeowner/contracting party fails to make the payment. On such termination the contractor may recover from the homeowner/contracting party payment for all work completed and for any loss sustained by him for materials, equipment, tools, or machinery to the extent of actual loss thereon plus loss of a reasonable profit, provided he can prove such loss and damages.

## Section VI. Assignment

This contract shall be assigned by contractor without the prior written consent of the owner.

## Section VII. Governing law

The contract documents shall be governed by the law of the place of the project.

## Section VIII. Compensation

DocuSign Envelope ID: ACA15E49-2654-42B2-A01B-B9D7752A074C

Homeowner/contracting party will pay contractor for performance of the work described in the preceding section $23,050.00 payable as follows:

a. $6,525 upon the execution of this agreement.

b. $2,163 on customer's receipt of funds from their insurance company.
c. $7,600 on completion of half of work outlined above.
d. $6,762 on final completion of the work and settlement of all claims of laborers and materialmen.

### Section IX. Attorneys fees

If Contractor brings an action for recovery of damages under the provisions of this contract, or because of homeowner's/contracting party's breach of other covenants or conditions contained in this contract, homeowner/contracting party agrees to pay contractor a reasonable attorney's fee to be fixed by the court.

### Section X. Corrections in work

Contractor shall be responsible for workmanship defects for a period of *[3]* months following completion of the work. The homeowner/contracting party shall notify the contractor in writing within *14* days after the discovery of a defect during this period, and the contractor shall correct the defect in accordance with the terms above. Contractor does not warranty commercially supplied materials such as pavers, bricks, concrete blocks or other items purchased from third party vendors or suppliers.

### Section XI. Partial Invalidity of Contract

The parties to this contract agree that if any of the provisions of the contract shall contravene or be invalid under the laws of the State of Tennessee, such a contravention or invalidity shall not invalidate the entire contract, but it shall be construed as if not containing the particular provision or provisions held to be invalid, and the rights and obligations of the parties shall be construed and enforced accordingly.

### Section XII. Entire Agreement

Contractor and homeowner/contracting party agree that the general conditions of the contract, the specifications and the drawings, if any, together with this agreement, form the contract, and that they are as fully a part of the contract as if attached here or repeated in this agreement. If any condition or conditions of such are in conflict either in meaning or by implication with the terms and conditions of the contract, the latter shall govern.

Contractor and homeowner/contracting party for themselves, their successors, executors, administrators and assigns, agree to the full performance of the covenants contained in this agreement. This agreement constitutes the entire agreement between the parties. Any changes or alterations in this agreement shall be valid and effective only if agreed upon in a separate and accompanying writing between the parties.

In witness, the parties have executed this agreement at *[712 Iva Ln]*, the day and year first above written.

NOTICE: All home improvement contractors must be licensed by the Tennessee Home Improvement Commission. Any inquiries about contractor should be transmitted to the Commissions office.

NOTICE TO OWNER: Do not sign this contract if blank. You are entitled to a copy of the contract at the time you sign.

DocuSigned by:

*Davey Sanderson*

DCA9F71E15A24CE...

*Homeowner/contracting party signature*

DocuSigned by:

*Damian Brant*

24DBF40A7291454...

*Contractor signature*

Davey Sanderson

*Homeowner/contracting party printed*

Damian Brant

*Contractor printed*

IN THE CIRCUIT COURT FOR KNOX COUNTY, TENNESSEE

FILE COPY

| | |
|---|---|
| KIMBERLY D. SANDERSON, and Husband,<br>DAVEY J. SANDERSON,<br>712 Iva Lane,<br>Knoxville, Tennessee 37918<br><br>    Plaintiffs,<br><br>v.<br><br>DYNAMIC TRADE, INC.,<br>c/o Kelly D. Tanner, its Registered Agent,<br>550 W. Main Street, Suite 600,<br>Knoxville, Tennessee 37902-2567,<br><br>and,<br><br>DAMIAN BRANT, Individually, and d/b/a,<br>DYNAMIC TRADE, INC.,<br>1625 Capitol Boulevard,<br>Knoxville, Tennessee 37931-4506,<br><br>and,<br><br>JOSHUA NELSON d/b/a<br>NELSON DEVELOPMENT f/k/a,<br>NELSON DEVELOPMENT, LLC<br>1441 Francis Station Drive,<br>Knoxville, Tennessee 37909-1124,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>No. 1-348-22<br><br>***TWELVE MEMBER<br>JURY REQUESTED*** |

---

## VERIFIED COMPLAINT

---

COME NOW the Plaintiffs, Kimberly D. Sanderson ("Mrs. Sanderson") and husband, Davey J. Sanderson ("Mr. Sanderson"), (collectively, "Plaintiffs" or the "Sandersons"), by and through the undersigned counsel, and for their claims and causes of action against Dynamic Trade, Inc., ("Dynamic"), Damian Brant d/b/a Dynamic Trade, Inc. ("Brant"), (collectively, the

1

EXHIBIT B

"Defendants"), and Joshua Nelson d/b/a Nelson Development f/k/a Nelson Development, LLC

("Nelson"), and state as follows:

<u>PARTIES</u>

1.     The Sandersons are citizens and residents of 712 Iva Lane, Knoxville, Knox

County, Tennessee 37918 (the "Residence").

2.     Upon information and belief, Dynamic is a for-profit corporation organized and

existing under the laws of the State of Tennessee and has its principal place of business at 1625

Capitol Boulevard, Knoxville, Knox County, Tennessee 37931-4506.  Dynamic may be served

with process through its Registered Agent, Kelly D. Tanner, at 550 W. Main Street, Suite 600,

Knoxville, Tennessee 37902.

3.     Upon information and belief, Brant is the sole shareholder of Dynamic, is the alter

ego of Dynamic, is an officer or principal agent of Dynamic, and at all times material to Plaintiffs'

claims is responsible for holding himself and Dynamic out as a licensed home improvement

contractor or contractor.  Brant may be served with process at 1625 Capital Boulevard, Knoxville,

Tennessee 37931-4506.

4.     Upon information and belief, Nelson is the alter ego of Nelson Development LLC,

an inactive for-profit limited liability company originally organized under the laws of the State of

Tennessee, was an officer or principal agent of Nelson Development LLC, was the sole member

of Nelson Development LLC, is now doing busing as both Nelson Development and Nelson

Development LLC, and at all times material to the Sandersons' claims was responsible for

allowing Defendants to use and advertise his home improvement contractor's license as

Defendants' own.  Nelson may be served with process at 1441 Francis Station Drive, Knoxville,

Knox County, Tennessee 37909-1124.

2

## JURISDICTION AND VENUE

5.      Jurisdiction in this Court is proper pursuant to Tennessee Code Annotated section

16-10-101.

6.      Venue in this Court is proper pursuant to Tennessee Code Annotated sections 20-

4-101 and 20-4-104.

## FACTUAL BACKGROUND

7.      On December 17, 2021, the Sandersons' Residence was damaged as the result of

a sewer backup.

8.      The Sandersons found Defendants through Defendants' advertising on the internet

that Brant used to advertise Dynamic as a licensed contractor at Defendants' website of

www.dynamictrade.com.

9.      Based upon Defendants' advertising that Dynamic was a licensed contractor, the

Sandersons contacted Defendants by telephone and scheduled an appointment for Defendants to

visit the Residence for the purpose of providing an estimate of repair.

10.     In and around the week of January 10, 2022, Mr. Sanderson met with Brant and

Bryan Utley at the Residence for the purpose of obtaining an estimate from Defendants to repair

the remaining damage at the Residence caused by the sewer backup.

11.     Prior to Defendants' arrival, the Sandersons had moved their belongings to

storage and retained Puro Clean to begin clearing carpet and other materials damaged from the

sewage backup.

12.     At their initial meeting with Mr. Sanderson, Defendants held themselves out as

licensed contractors capable and qualified to make the repairs at the Residence.

3

13.     The Sandersons were justified in relying upon Defendants' representations that they were capable and qualified to perform the contracting work they were offering to perform.

14.     During their first meeting, Brant told Mr. Sanderson that he was the owner of Dynamic.

15.     Upon information and belief, Brian Utley is Brant's business partner, acting as second in command, and was the point of contact for the Sandersons when Brant was unavailable.

16.     On or about January 18, 2022, Defendants provided the Sandersons with Estimate # 1003 that estimated that the cost to repair the damage at the Residence was $21,300 (the "January 18 Estimate").

17.     A true and accurate copy of the January 18 Estimate is attached hereto as Exhibit A and is incorporated herein by reference.

18.     On February 25, 2022, Mr. Sanderson and Defendants entered into a written contracting agreement (the "Contract") for Defendants to provide contracting services and repair the damage to the Residence for a total cost of $23,050 (the "Contract Price").

19.     According to the Defendants, the increase in cost from the January 18 Estimate to the Contract Price was due to a $1,750 price increase for an upgrade in flooring from carpet to laminate flooring.

20.     A true and accurate copy of the Contract is attached hereto as Exhibit B and is incorporated herein by reference.

21.     Although the Contract identifies Dynamic as a contractor with license number 9367 in the first introductory paragraph of the Contract, the Contract is only signed by Brant in his individual capacity.

4

22.     Upon information and belief, neither Dynamic nor Brant are licensed home improvement contractors, nor are they licensed contractors.

23.     Upon information and belief, the contractor license number of 9367 belonged to Nelson on February 25, 2022, and expired on May 31, 2022.

24.     Upon information and belief, neither Nelson Development nor Nelson Development LLC are legally assumed names of Dynamic, and neither Dynamic nor Brant were employees of Nelson Development or Nelson Development LLC on February 25, 2022.

25.     Defendants began performing contracting services at the Residence on February 25, 2022.

26.     Under the terms of the Contract, the Sandersons were to pay Defendants $6,525 upon the execution of the Contract.

27.     On or about February 25, 2022, in response to a Quickbooks payment request for Invoice # 1011 for an invoiced amount of $6,525 that they received from Defendants and in accord with the terms of the Contract, the Sandersons paid the Defendants $6,525 (the "February 25 Payment").

28.     Under the terms of the Contract, the Sandersons were to pay Defendants $2,163 when the Sandersons received funds for the repairs from their insurance company.

29.     On or about February 28, 2022, in response to a Quickbooks payment request for Invoice # 1011 for an invoiced amount of $8,688 that they received from Defendants and having received funds for the repairs from their insurance company, the Sandersons paid Defendants $2,163 (the "February 28 Payment").

30.     On or about March 2, 2022, Defendants provided the Sandersons with Estimate #

1008 that estimated additional contracting services totaling $8,650 to be added to the total

Contract Price (the "March 2 Estimate").

31.     A true and accurate copy of the March 2 Estimate is attached hereto as <u>Exhibit C</u>

and is incorporated herein by reference.

32.     According to Defendants, the March 2 Estimate added costs for contracting

services that were not originally included in or covered by the Contract.

33.     With the inclusion of the March 2 Estimate of $8,650 to the original Contract

Price of $23,050, the total value of the contracting services offered by Defendants as of March 2,

2022, was $31,700.

34.     The Sandersons neither agreed to the services contained in the March 2 Estimate

nor did they sign any agreement amending the Contract to include the additional work described

in the March 2 Estimate.

35.     On or about March 15, 2022, in response to a Quickbooks payment request for

Invoice # 1014 for an invoiced amount of $750 that they received from Defendants, the

Sandersons paid the Defendants $750 (the "March 15 Payment").

36.     Defendants offered no explanation for the $750 requested in Invoice # 1014.

37.     On or about March 17, 2022, in response to a Quickbooks payment request for

Invoice # 1010 for an invoiced amount of $2,750 that they received from Defendants, the

Sandersons paid Defendants $2,750 (the "March 17 Payment").

38.     Defendants offered no explanation for the $2,750 requested in Invoice # 1010 nor

did they explain why the Invoice # 1010 was numerically before their first Invoice # 1011 that

they had first paid in full on February 25 and then again when the total amount outstanding for Invoice # 1011 had inexplicably changed on February 28, 2022.

39.    On or about March 18, 2022, in response to a Quickbooks payment request for Invoice # 1015 for an invoiced amount of $3,800 that they received from Defendants, the Sandersons paid Defendants $3,800 (the "March 18 Payment").

40.    Defendants offered no explanation for the $3,800 requested in Invoice # 1015.

41.    Under the terms of the Contract, the Sandersons were to pay Defendants $7,600 upon completion of half of the work under the terms of the Contract, but by March 18, 2022, half of the work had not been completed.

42.    By March 22, 2022, the Sandersons had paid Defendants $15,988, or approximately 69% of the total monetary value of the Contract Price, but less than one-half of the work had been performed.

43.    On March 31, 2022, Defendants told the Sandersons that they had performed all contracting services under the terms of the Contract.

44.    On or about April 1, 2022, Defendants provided the Sandersons with Estimate # 1019 that estimated additional contracting services totaling $6,788.94 that should have been included in the Contract Price but that Defendants were now claiming they should be paid in addition to the Contract Price (the "April 1 Estimate").

45.    With the inclusion of the April 1 Estimate of $6,788.94 to the March 2 Estimate of $8,650 and the original Contract Price of $23,050, the total value of the contracting services offered by the Defendants as of April 1, 2022, was $38,488.94.

46.    The Sandersons neither agreed to the addition of the contracting services outlined in the April 1 Estimate beyond which they had already agreed to in the Contract nor did the

7

Sandersons sign any amendment to the Contract agreeing to pay for the services described in the April 1 Estimate.

47.     A true and accurate copy of the April 1 Estimate is attached hereto as <u>Exhibit D</u> and is incorporated herein by reference.

48.     On or about April 3, 2022, the Sandersons notified Defendants in writing that the work that had been performed by Defendants was not performed in a workmanlike manner, was of exceptionally poor quality, and was not as agreed.

49.     In their April 3, 2022, writing to Defendants, the Sandersons included numerous photographs of the defective contracting work and made demand for Defendants to cure the defects and complete the work as agreed.

50.     Increasingly concerned with the poor quality of the contracting services that were performed by Defendants at their Residence, on April 4, 2022, the Sandersons researched the contractor's license number that Defendants stated was theirs in the Contract and learned for the first time that Nelson Development LLC was the home improvement contractor registered to that number.

51.     On or about April 4, 2022, the Sandersons called Nelson and learned that he was aware that Defendants were using his home improvement contractor's license to market themselves as licensed contractors and form contracts for contracting services and that he approved of the use of his license in this manner.

52.     Nelson told the Sandersons that he works with Brant.

53.     Nelson told the Sandersons to email pictures of problems with Defendants' contracting work at the Residence to Brant, and that he would make sure Brant received the email.

8

54.    On or about April 4, 2022, the Sandersons notified Defendants in writing of the following work that was performed in an unworkmanlike manner:

    a.  Girls Room Front Bedroom

        i.  Closet doors not hung back up

        ii.  Trim not cut correctly throughout

        iii.  Paint on flooring in at least five (5) places

        iv.  Drywall in closet exposed

        v.  Flooring problems

        vi.  Unconnected piece near closet frame

        vii.  Air vent flooring cut very poorly

        viii.  "Flooring separation or crack" near closet entrance and near entrance into the bedroom

    b.  Hallway

        i.  Hallway flooring ran in the wrong direction (opposite from the rest of the flooring in the entire house)

        ii.  Flooring problems

        iii.  Flooring in five (5) small pieces entering into the hallway from the front bedroom and also out of alignment

        iv.  Incorrectly installed section of flooring, 2" x 9" in size, at the entrance to the hallway that is out of alignment and disconnected from the remaining flooring in the hallway

        v.  In the middle of the hallway there is a chip and defect

        vi.  Subflooring exposed around door frame in at least five (5) places

9

      vii.   Uneven flooring piece and caulk line in the hallway entering into the living room

     viii.   Trim was cut to a length shorter than required, and instead of installing the correct length piece, a patch piece was poorly attached to the end of the trim in a corner area.  This poor craftsmanship is evident in two separate areas in the hallway

      ix.   Trim does not extend to the wall in the corners

       x.   Partial piece of old trim was left in the corner near the air return

      xi.   Trim ends are not cut correctly throughout the hallway

     xii.   Transition line near living room not laid properly and was stapled in at least two (2) places

    xiii.   Caulk line and flooring separation entering into the hallway closet

    xiv.   Hallway flooring has white paint from the trim being painted after installation

c.  Hallway Closet

      i.  Subflooring exposed on all four (4) sides including at bottom of door frame.

     ii.  No small trim in the entire closet

d.  Hallway Drywall

      i.  All drywall in the hallway is visible and not properly done or painted correctly

     ii.  Drywall tape is exposed in at least two (2) places

e.  Hallway Bathroom

    i.   Flooring issues

   ii.   Transition line not properly cut exposing subflooring

  iii.   Upon entering the bathroom there is an approximately 25" piece of flooring going in the wrong direction

  iv.   Incorrectly installed section of flooring, in two different areas in the bathroom, is out of alignment and disconnected from the remaining flooring in the bathroom

   v.   Vent hole cut very poorly

  vi.   Glue on flooring from vanity

  vii.   Trim end not cut correctly

 viii.   Crack in trim behind toilet.

  ix.   Drywall is visible and not smooth

   x.   Did not properly install the vanity.  It is off centered from the mirror and is not flush with the wall in the back on the lefthand side.  Both trims were left on behind and to the side of the vanity

  xi.   Trim was not installed at the bottom of the vanity

  xii.   No back to the vanity

 xiii.   Sink drain/piping leaks water into the vanity

 xiv.   Bathroom door appears to have been cut, especially at the top.  Also, the bottom of the door appears to be split

  xv.   Toilet leaks at the connection to the wall

11

xvi.   Paint around the shower/tub wall is poorly done.  There are places where the old paint is exposed and places where paint is on the ceiling

xvii.   The paint was not properly matched nor were we given an option of what color of paint we wanted

xviii.   We were not given an option about the bathroom/tub that was being installed.  The bathtub/shower wall kit is of extremely low quality and cheaply made.  The shower wall kit was $99 and the tub was $199.00.  These items were not reasonable or adequate replacements

xix.   There is caulking all on the shower walls.  It is poorly done and very noticeable

xx.   There are seams of the shower wall panels not glued down or caulked properly

xxi.   The shower plumbing behind the shower wall leaks onto the subflooring all the way through to underneath the house

xxii.   The toilet is of a very low quality and we were not given an option to pick out our own toilet.  It is not a reasonable or adequate replacement

f.   Jaxson's Room (Back Bedroom)

i.   Flooring issues

ii.   Floor separation pieces near transition strip

iii.   The flooring was nailed at least seven (7) times at the entrance of the bedroom

    iv.  There are at least two (2) uneven places in the flooring in the front middle of the room

    v.  Subflooring exposed near the closet door frame

    vi.  Trim issues. Trim edges were not cut properly.  There are places in the trim in the middle of the wall that are not connected and white caulking was poorly placed over the separations to try to hide the mistakes in at least six (6) places

    vii.  There is a chunk of trim separate from the other trim in the closet

g.  Living Room and Kitchen

    i.  Flooring issues.

    ii.  We were not consulted on what direction the flooring would flow.

    iii.  There are four (4) or more places in the flooring that are uneven.   One such place is in the middle of the living room and another is around the area of the door leading into the garage

    iv.  There are separations in the white trim that are poorly caulked and visible

    v.  There are no transition pieces from the flooring to the hearth

    vi.  Black trim around the island and a corner is sticking out

h.  Living Room Closet

    i.  Flooring issues

    ii.  Subflooring exposed at the bottom of the door trim/frame

    iii.  Uneven flooring separation between flooring pieces at the entry of the closet.  Grey caulking is also visible

13

        iv. Trim not properly cut at the edges

i. Master Bedroom

        i. Subflooring exposed at the bottom of the door frame

        ii. There are at least three (3) places in the flooring that are separated or not flush

        iii. The flooring has been nailed at least three (3) times in the middle\left of the floor

        iv. There are viable caulk lines on a few pieces of the flooring

        v. The trim was not properly cut at the ends

j. Master Closet

        i. Subflooring exposed at the bottom of the door trim/frame

        ii. Trim not properly cut at ends

k. Master Bathroom

        i. Subflooring exposed at the bottom of the door trim/frame

        ii. Flooring has been nailed at least two (2) times at the entrance of the bathroom

        iii. There is a very visible gray caulk line going from one side of the door frame to the other side

        iv. The vent hole was poorly cut

        v. The flooring at the edge of the garden tub is going in the wrong direction. There are very visible separation places in the flooring in this area with brown caulking smeared over it to try to hide it but it looks terrible

14

    vi.   There is brown caulking smeared all over the edge of the bathtub

    vii.   The white caulking at the edge of the bathtub was very poorly done and smeared on the tile and the bathtub

    viii.   We were not consulted on what toilet was installed. The toilet that was installed is of a very low quality and not a reasonable or adequate replacement

    ix.   This toilet is smaller than our other prior toilet and so white paint is visible on each side of the toilet

    x.   The toilet is caulked at the bottom which is not supposed to be done.  The white caulk is smeared on the base of the toilet and the flooring

    xi.   Trim was not placed under the vanity in several places

    xii.   The trim ends were not cut properly

    xiii.   Trim was placed over the tile in at least two (2) places

l.   The Residence was left with saw dust and dirt in every room.  None of the floors appeared to have been vacuumed or mopped

m.   Crawl Space

    i.   The main water line coming into the Residence was disconnected.  A coupling/pipe connector was popped loose/disconnected (most likely during the shower/tub pipe replacement).  This was not fixed.  The Residence was left with no running water.  The water was working prior to the shower/tub pipe replacement

n.   Outside

15

       i.   There was debris and trash left in the yard and driveway of the

          Residence

55.     Defendants refused to perform any repairs or even return to the Residence to

examine the quality of the work about which the Sandersons were complaining.

56.     Instead, on or about April 6, 2022, Defendants emailed the Sandersons and told

them to expect to receive contact from Defendants' attorney.

57.     The Sandersons never spoke with Defendants again, but they did receive a letter

dated May 2, 2022, with a demand for $18,762 from Defendants' attorney.

58.     In addition to the $15,988 that the Sandersons had already paid Defendants,

Defendants' demand to be paid an additional $18,762 would have meant that Defendants claimed

to have performed a total of $34,750 in contracting services for the Sandersons.

59.     On or about April 9, 2022, an inspection of the Residence and the contracting

services that had been performed by Defendants (the "Inspection") was completed.

60.     The repairs made by Defendants failed the Inspection due to the number of

unfinished repairs and the fact that many of the repairs that were made were performed in an

unworkmanlike manner.

61.     It is estimated that only approximately fifty (50) percent of the necessary repairs

had been completed as of the Inspection, with most of the repairs that were made requiring

corrective work or additional repairs.

62.     After their insurance carrier refused to pay for any further storage charges to store

the contents of the Residence while the Sandersons waited for repairs to be made, the Sandersons

were forced to move the contents of the Residence back into the Residence.

16

63.     After their insurance carrier refused to pay for alternative living accommodations while the Residence was waiting to be repaired, the Sandersons were forced to move back into the Residence and try to live among incomplete repairs, repairs that were not performed in a workmanlike manner, repairs that were never made at all, or hazardous conditions caused by faulty repairs.

64.     After Defendants refused to perform under the Contract as agreed, and because of Defendants' demand to be paid for work that was performed in an unworkmanlike manner, the Sandersons hired legal counsel to determine their remedies.

65.     On or about April 7, 2022, and after hiring legal counsel, the Sandersons discovered that Defendants are neither licensed home improvement contractors nor are they licensed contractors in the State of Tennessee.

66.     On or about May 25, 2022, the Sandersons obtained an estimate to complete the repairs that Defendants were obligated to make under the terms of the Contract and to repair the work that Defendants had performed in an unworkmanlike manner (the "Repair Estimate").

67.     The Repair Estimate totaled $21,115.

68.     In addition to the cost of the repairs from a third-party licensed contractor to complete the scope of work that was to have been performed under the terms of the Contract, the Sandersons will also incur the cost of moving the contents of the Residence back to storage and for alternate living accommodations while the Residence is being repaired by a third-party licensed contractor.

[THIS SECTION WAS INTENTIONALLY LEFT BLANK]

## COUNT I

## VIOLATION OF THE HOME IMPROVEMENT CONTRACTORS ACT

69.     The Sandersons incorporate by reference and reallege each averment contained in the paragraphs that appear hereinabove.

70.     In Knox County, Tennessee, a home improvement contractor's license is required to maintain, own, operate, or transact a home improvement business.

71.     In Knox County, Tennessee, a home improvement contractor's license is required to engage in or transact any home improvement contract with a value of $3,000 up to $24,999.99.

72.     In Knox County, Tennessee, a home improvement contractor's license is required before one can represent to the public that one is legally qualified to perform contracting services with a value of $3,000 up to $24,999.99.

73.     In Knox County, Tennessee, a contract for home improvement must state the license number of the home improvement contractor.

74.     In Knox County, Tennessee, a home improvement contractor is prohibited from conducting a home improvement business in any name other than the one in which the contractor is licensed to perform home improvements.

75.     In Knox County, Tennessee, a home improvement contractor is prohibited from engaging in any fraud in the execution of any contract incident to a home improvement transaction.

76.     In Knox County, Tennessee, a home improvement contractor is prohibited from failing to notify the Board for Licensing Contractors of any change of control in ownership, management, or business name or location.

18

77.     In Knox County, Tennessee, a home improvement contractor is prohibited from advertising in any manner that it is licensed under the Home Improvement Contractors Act unless the advertisement includes an accurate reference to the appropriate license number.

78.     In Knox County, Tennessee, a home improvement contractor is prohibited from willfully deviating from or disregarding plans or specifications in any material respect of a home improvement project without the consent of the owner.

79.     Upon information and belief, Defendants were not licensed home improvement contractors in Tennessee when Defendants offered to engage in home improvement contracting services for the Sandersons.

80.     Upon information and belief, Defendants were not licensed home improvement contractors in Tennessee when Defendants offered to perform contracting services with a value in excess of $3,000 at the Residence.

81.     Upon information and belief, Defendants were not licensed home improvement contractors in Tennessee when Defendants formed the Contract with the Sandersons.

82.     Upon information and belief, Defendants were not licensed home improvement contractors in Tennessee when Defendants undertook to perform home improvement contracting services for the Sandersons at a cost in excess of $3,000.

83.     Upon information and belief, Defendants were sophisticated parties at the time Defendants offered to perform, contracted to perform, and undertook to perform contracting services to repair the Residence, and Defendants knew or should have known that the contracting services they were offering to perform, contracting to perform, and undertaking to perform required them to be licensed home improvement contractors.

19

84. Defendants violated the Home Improvement Contractors Act in the following ways:

a. Defendants engaged in and transacted a home improvement business without being licensed to do so in violation of Tennessee Code Annotated § 62-6-502(a);

b. Defendants represented themselves to the Sandersons and to the public as doing home improvement business in Tennessee without being licensed to do so in violation of Tennessee Code Annotated § 62-6-502(a);

c. Defendants offered to transact home improvement business without being licensed to do so in violation of Tennessee Code Annotated § 62-6-502(a);

d. Defendants maintained, owned, and operated a home improvement business without a license in violation of Tennessee Code Annotated § 62-6-502(b);

e. Defendants' Contract did not contain the complete agreement between the Sandersons and Defendants in violation of Tennessee Code Annotated § 62-6-508(a)(1);

f. Defendants' Contract did not state a valid home improvement license number for Defendants in violation of Tennessee Code Annotated § 62-6-508(a)(2);

g. Defendants' Contract did not contain a description of all the work to be done and the goods to be used in violation of Tennessee Code Annotated § 62-6-508(a)(2);

h. To the extent that the Contract was to include work described in the April 1 Estimate and/or the March 2 Estimate, Defendants' Contract did not contain the agreed upon consideration for the work in violation of Tennessee Code Annotated § 62-6-508(a)(5);

20

i.      Defendants' Contract did not contain all other matters upon which the parties lawfully agreed in violation of Tennessee Code Annotated § 62-6-508(a)(7);

j.      Defendants violated Tennessee Code Annotated § 62-6-510(1) by abandoning or willfully failing to perform, without justification, the Contract without the consent of the Sandersons;

k.      Defendants violated Tennessee Code Annotated § 62-6-510(2) by substantially misrepresenting their qualifications as licensed home improvement contractors to procure the Contract with the Sandersons;

l.      Defendants violated Tennessee Code Annotated § 62-6-510(3) by fraudulently representing that the license number on the Contract was theirs and by fraudulently representing that they were qualified to perform the home improvement contracting services that they advertised to the Sandersons to induce the Sandersons into entering into the Contract;

m.      Defendants violated Tennessee Code Annotated § 62-6-510(5) by willfully and/or deliberately disregarding the building laws of the State of Tennessee and Knox County, Tennessee by failing to have a home improvement contractors license when they knew one was needed for the contracting work they offered to perform, contracted to perform, and attempted to perform for the Sandersons at the Residence;

n.      Defendants violated Tennessee Code Annotated § 62-6-510(9) by advertising that they were licensed home improvement contractors; and,

o.      Defendants violated Tennessee Code Annotated § 62-6-510(13) by failing to obtain the necessary permits as required by Knox County, Tennessee.

85.     Nelson violated the Home Improvement Contractors Act in the following ways:

21

a.  By assigning or transferring his home improvement contractors license to Defendants in violation of Tennessee Code Annotated § 62-6-507(b);

b.  By allowing Defendants to use his home improvement contractors license number as though it were Defendants' license to advertise home improvement contracting services to the Sandersons and the public to induce the Sandersons and the public to hire Defendants to perform home improvement contracting services in violation of Tennessee Code Annotated § 62-6-510(2);

c.  By allowing Defendants to use his home improvement contractors license number on their home improvement contracts to fraudulently create the appearance that Defendants were licensed home improvement contractors and to fraudulently induce the Sandersons and the public to enter into home improvement contracts with Defendants under the belief that Defendants were licensed home improvement contractors in violation of Tennessee Code Annotated §§ 62-6-510(3) and 62-6-510(5);

d.  By failing to notify the board for licensing contractors of any change of control in ownership, management, or business name or location in violation of Tennessee Code Annotated § 62-6-510(7); and,

e.  By conducting a home improvement business in a name other than the one in which Nelson was licensed in violation of Tennessee Code Annotated § 62-6-510(8).

86.  As a direct and legal result of Defendants' violations of the Home Improvement Contractors Act, the Sandersons have been damaged and have incurred, or will incur, the costs associated with repairing the Residence, the costs associated with moving and storing their personal property while the Residence is being repaired, the costs of alternative living

arrangements while the Residence is being repaired, as well as the costs related to prosecuting this lawsuit.

87.     As a direct and legal result of Nelson's violations of the Home Improvement Contractors Act, the Sandersons have been damaged and have incurred, or will incur, the costs associated with repairing the Residence, the costs associated with moving and storing their personal property while the Residence is being repaired, the costs of alternative living arrangements while the Residence is being repaired, as well as the costs related to prosecuting this lawsuit.

88.     In accordance with Tennessee Code Annotated § 62-6-503(e), the Sandersons are entitled to recover treble damages from Defendants.

89.     In accordance with Tennessee Code Annotated § 62-6-518(b) and § 62-6-510(3), the Sandersons are entitled to recover their reasonable attorney's fees, treble damages, and/or punitive damages from the Defendants and Nelson.

## COUNT II
### VIOLATION OF THE CONTRACTOR'S LICENSING ACT OF 1994

90.     The Sandersons incorporate by reference and reallege each averment contained in the paragraphs that appear hereinabove.

91.     In Tennessee, a contractor's license is required prior to offering to perform contracting services for projects with a value of $25,000 or more.

92.     Defendants were not licensed contractors in Tennessee when Defendants offered to perform additional contracting services for the Sandersons on or about March 2, 2022, that

increased the value of the contracting services being offered by Defendants from the Contract Price of $23,050 to $31,700.

93.     Defendants were not licensed contractors in Tennessee when Defendants offered to perform additional contracting services for the Sandersons on or about April 1, 2022, that increased the value of the contracting services being offered by Defendants from the Contract Price of $23,050 to either $38,488.94 if the March 2 Estimate of $8,650 is included or $29,838.84 beyond the original Contract Price of $23,050.

94.     If Defendants argue that they performed work for the Sandersons that included the value of the March 2 Estimate, the value of the April 1 Estimate, or the value of both the March 2 Estimate and the value of April 1 Estimate, all beyond the Contract Price, then Defendants were not licensed contractors in Tennessee when Defendants undertook to perform contracting services for the Sandersons with a total value of more than $25,000.

95.     Upon information and belief, Defendants were sophisticated parties, and at the time Defendants offered to perform and undertook to perform contracting services to repair the Residence, Defendants knew or should have known that the contracting services they were offering to perform and undertaking to perform required them to be licensed contractors.

96.     Defendants violated the Contractors Licensing Act of 1994 in the following ways:

a.     Defendants offered to engage in contracting without being licensed to do so in violation of Tennessee Code Annotated § 62-6-103(a)(1);

b.     Defendants engaged in contracting in Tennessee without being licensed to do so in violation of Tennessee Code Annotated § 62-6-103(a)(1); and,

c.      Defendants represented themselves as licensed contractors and acted in the

capacity of "contractors" while not licensed to do so in violation of Tennessee Code

Annotated § 62-6-136(a).

97.      As a direct and legal result of Defendants' violations of the Tennessee Contractors

Licensing Act of 1994, the Sandersons have been damaged and have incurred, or will incur, the

costs associated with repairing the Residence, the costs associated with moving and storing their

personal property while the Residence is being repaired, the costs of alternative living

arrangements while the Residence is being repaired, as well as the costs related to prosecuting

this lawsuit.

98.      In accordance with Tennessee Code Annotated § 62-6-136(b) (b), the Sandersons

are entitled to recover their reasonable attorney's fees, treble damages, and/or punitive damages

from Defendants.


## COUNT III
## VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT OF 1977


99.      The Sandersons incorporate by reference and reallege each averment contained in

the paragraphs that appear hereinabove.

100.      The actions and inactions of Defendants and Nelson described hereinabove

constitute unfair or deceptive acts or practices affecting the conduct of trade or commerce under

Tennessee Code Annotated § 47-18-104(a).

101.      Defendants and Nelson's violation of Tennessee Code Annotated § 62-6-510(3)

constitutes an unfair or deceptive act or practice affecting the conduct of trade or commerce

under the Tennessee Consumer Protection Act of 1977 pursuant to Tennessee Code Annotated §

25

62-6-518(b) and entitles the Sandersons to recover their reasonable attorney's fees, treble damages, and/or punitive damages from the Defendants.

102.    Defendants' violation of Tennessee Code Annotated § 62-6-102 constitutes an unfair or deceptive act or practice affecting the conduct of trade or commerce under the Tennessee Consumer Protection Act of 1977 pursuant to Tennessee Code Annotated § 62-6-136(b) and entitles the Sandersons to recover their reasonable attorney's fees, treble damages, and/or punitive damages from the Defendants.

103.    Defendants' actions and inactions described hereinabove are in violation of Tennessee Code Annotated § 47-18-104(b)(1) because Defendants falsely passed off their services as those of a licensed home improvement contractor.

104.    Defendants' actions and inactions described hereinabove are in violation of Tennessee Code Annotated § 47-18-104(b)(2) because Defendants caused the likelihood of confusion or misunderstanding as to the source and/or certification of its services.

105.    Defendants' actions and inactions described hereinabove are in violation of Tennessee Code Annotated § 47-18-104(b)(3) because Defendants caused the likelihood of confusion or misunderstanding as to affiliation with, connection or association with, or certification by, another.

106.    Defendants' actions and inactions described hereinabove are in violation of Tennessee Code Annotated § 47-18-104(b)(5) because Defendants represented that their services had approval benefits that they did not have.

107.    Defendants' actions and inactions described hereinabove are in violation of Tennessee Code Annotated § 47-18-104(b)(35) because Defendants represented that they were

26

licensed as a contractor as required by Tennessee Code Annotated § 62-6-502 when Defendants were not licensed.

108.    Defendants' actions and inactions described hereinabove are in violation of Tennessee Code Annotated § 47-18-104(b)(35) because Defendants acted in the capacity of a contractor while not licensed.

109.    Defendants' actions and inactions described hereinabove are in violation of Tennessee Code Annotated § 47-18-104(b)(47)(A) because Defendants did not provide the Sandersons with in written form:

      i.    That it is a criminal offense for the person entering into the contract for home improvement services with a residential owner to do any of the prohibited acts set out in § 39-14-154(b), by writing out the text of each prohibited act and providing the penalty and available relief for such; and;

      ii.    The true and correct name, physical address, and telephone number of the home improvement services provider; or, in the alternative,

      iii.    A correct current or forwarding address if the Defendants changed the physical address initially provided to the Sandersons and any or all work to be performed under the Contract has not been completed.

110.    Nelson Development's actions and inactions described hereinabove are in violation of Tennessee Code Annotated § 47-18-104(b)(1) because Nelson falsely passed off his services as those of another by sanctioning Defendants' use of his license number.

111.    Nelson's actions and inactions described hereinabove are in violation of Tennessee Code Annotated § 47-18-104(b)(2) because Nelson caused the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of services by allowing

Defendants to use of his home improvement contractors license number for advertising and contracting purposes.

112.    Nelson's actions and inactions described hereinabove are in violation of Tennessee Code Annotated § 47-18-104(b)(3) because Nelson caused the likelihood of confusion or misunderstanding as to affiliation or association of Defendants with or certification of Defendants by the Contractors Licensing Board by allowing Defendants to use of his home improvement contractors license number.

113.    Nelson's actions and inactions described hereinabove are in violation of Tennessee Code Annotated § 47-18-104(b)(7) because by Nelson allowing Defendants to use his home improvement contractors license number for advertising and contracting purposes, Nelson directly or indirectly represented that Defendants' services are of a particular standard, quality, or grade that are of another.

114.    Nelson's actions and inactions described hereinabove are in violation of Tennessee Code Annotated § 47-18-104(b)(35) because Nelson directly or indirectly represented that Defendants were licensed contractors by allowing Defendants to use his home improvement contractors license number to advertise and contract for contracting services when Defendants were not licensed as either a home improvement contractor or a contractor.

115.    As a direct and legal result of Defendants' and Nelson's violations of the Tennessee Consumer Protection Act of 1977, the Sandersons have been damaged and have incurred, or will incur, the costs associated with repairing the Residence, the costs associated with moving and storing their personal property while the Residence is being repaired, the costs of alternative living arrangements while the Residence is being repaired, as well as the costs related to prosecuting this lawsuit.

28

116.    The Defendants' use or employment of the unfair or deceptive acts or practices described above were done willfully and knowingly by Defendants, and the Sandersons should be awarded three (3) times their actual damages sustained if they are not awarded exemplary or punitive damages for the same unfair or deceptive practices in accordance with Tennessee Code Annotated § 47-18-109(a)(3).

117.    Nelson's use or employment of the unfair or deceptive acts or practices described above were done willfully and knowingly by Nelson, and the Sandersons should be awarded three (3) times their actual damages sustained if they are not awarded exemplary or punitive damages for the same unfair or deceptive practices in accordance with Tennessee Code Annotated § 47-18-109(a)(3).

118.    Having employed unfair or deceptive acts or practices to procure the Contract, the Contract should be set aside and voided, such that Defendants should receive no benefit from the Contract, as additional relief that is necessary and proper, pursuant to Tennessee Code Annotated § 47-18-109(a)(3).

119.    Because the Defendants violated the Tennessee Consumer Protect Act of 1977, the Sandersons should be awarded their reasonable attorneys' fees and the costs of this case in accordance with Tennessee Code Annotated § 47-18-109(e)(1).

**COUNT IV**

**FRAUD / FRAUDULENT INDUCEMENT**

120.    The Sandersons incorporate by reference and reallege each averment contained in the paragraphs that appear hereinabove.

29

121.    Defendants intentionally, willfully, and knowingly falsely represented to the Sandersons that they were licensed home improvement contractors or contractors when Defendants advertised that they were qualified to perform the contracting services that they offered to perform and used Nelson's home improvement contractors license number to create the false impression that they were licensed contractors.

122.    Defendants made their false representations to the Sandersons with the intent to induce the Sandersons into entering into the Contract for contracting services with the Defendants.

123.    The Sandersons reasonably relied upon Defendants' false representations because the Sandersons were unsophisticated parties who reasonably believed Defendants' false advertising and use of an existing license number meant that Defendants were qualified and licensed to perform the contracting services that Defendants offered to perform.

124.    As a direct and legal result of the Defendants' fraud and fraudulent inducement described above, the Sandersons entered into the Contract.

125.    The Contract between the Sandersons and Defendants should be set aside and voided, such that Defendants should receive no benefit from the Contract that they procured by fraud.

126.    As a direct and legal result of Defendants' fraud and fraudulent inducement, the Sandersons have been damaged and have incurred, or will incur, the costs associated with repairing the Residence, the costs associated with moving and storing their personal property while the Residence is being repaired, the costs of alternative living arrangements while the Residence is being repaired, as well as the costs related to prosecuting this lawsuit.

30

## COUNT V
## INTENTIONAL MISREPRESENTATION

127.    The Sandersons incorporate by reference and reallege each averment contained in the paragraphs that appear hereinabove.

128.    Prior to forming the Contract with the Sandersons, Defendants represented to the Sandersons that Defendants were licensed contractors.

129.    Defendants were not licensed contractors when Defendants represented to the Sandersons that they were so licensed.

130.    At the time Defendants represented to the Sandersons that they were licensed contractors, Defendants knew that they were not licensed.

131.    The Contract that Defendants drafted states in the first paragraph that Defendants are licensed contractors and refers to license number 9397.

132.    The Sandersons reasonably relied on Defendants' representations to them that Defendants were licensed contractors.

133.    Had the Sandersons known that Defendants were not licensed contractors, they would not have entered into the Contract.

134.    The Contract between the Sandersons and Defendants should be set aside and voided, such that Defendants should receive no benefit from the Contract that they procured by their intentional misrepresentations.

135.    As a direct and legal result of Defendants' intentional misrepresentations described above, the Sandersons have been damaged and have incurred, or will incur, the costs associated with repairing the Residence, the costs associated with moving and storing their personal property while the Residence is being repaired, the costs of alternative living

31

arrangements while the Residence is being repaired, as well as the costs related to prosecuting this lawsuit.

## COUNT VI
## CIVIL CONSPIRACY

136.    The Sandersons incorporate by reference and reallege each averment contained in the paragraphs that appear hereinabove.

137.    Defendants and Nelson intentionally, willfully, knowingly, and with utter disregard for the licensing requirements for contractors and home improvement contractors in the State of Tennessee, committed a civil conspiracy by conspiring to violate the Home Improvement Contractors Act, the Contractors Licensing Act of 1994, and the Tennessee Consumer Protection Act of 1977.

138.    Defendants and Nelson acted in concert to violate the Home Improvement Contractors Act, the Contractors Licensing Act of 1994, and the Tennessee Consumer Protection Act of 1977.

139.    Defendants and Nelson intentionally, willfully, knowingly, and with utter disregard for the licensing requirements for contractors and home improvement contractors in the State of Tennessee, committed a civil conspiracy by conspiring to create the false impression that Defendants were licensed contractors in Tennessee to induce the Sandersons into entering into a contract with Defendants for contracting services for which a home improvement contractors license and/or contractors license were required.

140.    As a direct and legal result of Defendants and Nelson's civil conspiracy, the Sandersons have been damaged and have incurred, or will incur, the costs associated with

repairing the Residence, the costs associated with moving and storing their personal property while the Residence is being repaired, the costs of alternative living arrangements while the Residence is being repaired, as well as the costs related to prosecuting this lawsuit.

## COUNT VII
## BREACH OF CONTRACT

141.    The Sandersons incorporate by reference and reallege each averment contained in the paragraphs that appear hereinabove.

142.    In the alternative, Defendants materially breached the terms of the Contract by:

a.    Failing to complete the scope of the contracting work described in the Contract; and/or,

b.    Failing to perform their work in a workmanlike manner.

143.    The Sandersons provided proper notice to Defendants that their work was unsatisfactory and incomplete.

144.    Defendants failed to adequately address the Sandersons' complaints about the quality of their contracting work.

145.    As a direct and legal result of Defendants' material breach of the terms of the Contract, the Sandersons have been damaged and have incurred, or will incur, the costs associated with repairing the Residence, the costs associated with moving and storing their personal property while the Residence is being repaired, the costs of alternative living arrangements while the Residence is being repaired, as well as the costs related to prosecuting this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray as follows:

1.      That Defendants and Nelson be served with a copy of this Complaint and a Summons and be required to respond to this Complaint within the time required by the Tennessee Rules of Civil Procedure;

2.      That a twelve member jury be empaneled to hear this case;

3.      That the Court find that the Contract between the parties should be of no legal effect or be voided because it was procured by fraud or fraudulent inducement and in otherwise set aside under the provisions of Tennessee Code Annotated § 47-18-109(a)(3);

4.      That Plaintiffs have and recover of Defendants and Nelson their actual damages to be proved at the trial of this cause, which actual damages shall not exceed $100,000;

5.      That Plaintiffs have and recover of Defendants and Nelson treble damages pursuant to Tennessee Code Annotated §§ 62-6-136(b), 62-6-518(b), and 47-18-109(a)(3);

6.      That Plaintiffs have and recover of Defendants and Nelson their reasonable attorneys' fees incurred in prosecuting this action through to its conclusion pursuant to Tennessee Code Annotated §§ 62-6-136(b), 62-6-518(b), and 47-18-109(e)(1);

7.      That Plaintiffs have and recover of Defendants and Nelson the costs of this case including ordinary court costs and discretionary costs; and,

8.      That Plaintiffs have and recover such other general and further relief to which they may prove entitled in this case.

34

RESPECTFULLY SUBMITTED this the 5th day of December, 2022.

G. KEITH ALLEY, P.C.

By: _____
G. KEITH ALLEY (BPR# 017702)
P.O. Box 22190
Knoxville, Tennessee 37933
Telephone: (865) 385-8623
Email: keith@tnlitigator.com
*Attorney for Plaintiffs*

## COST BOND

We acknowledge ourselves as surety for all court costs and taxes in this cause in accordance with Tennessee Code Annotated § 20-12-120.

PRINCIPALS:

_____
KIMBERLY D. SANDERSON

_____
DAVEY J. SANDERSON

SURETY:

G. KEITH ALLEY, P.C.

By: _____
G. KEITH ALLEY (BPR# 017702)

Its:  President

35

VERIFICATION

STATE OF _Tennessee_ )
COUNTY OF _Knox_ )

I, KIMBERLY D. SANDERSON, having first been duly sworn according to law, hereby depose
and say that I am the Defendant/Counter-Plaintiff in this case, I have read the foregoing
Amended Verified Counter-Complaint, and the factual allegations contained therein are true and
accurate to the best of my knowledge, information and belief.

_Kimberly D. Sanders_
KIMBERLY D. SANDERSON

Sworn to and subscribed before me
this the _5th_ day of December, 2022.

_Zoe Antigone McKenzie_
Notary Public

My Commission Expires: _10/03/26_



36

VERIFICATION

STATE OF _Tennessee_ )
COUNTY OF _Knox_ )

I, DAVEY J. SANDERSON, having first been duly sworn according to law, hereby depose and
say that I am the Defendant/Counter-Plaintiff in this case. I have read the foregoing Amended
Verified Counter-Complaint, and the factual allegations contained therein are true and accurate
to the best of my knowledge, information and belief.

_Davey J. Sanderson_
DAVEY J. SANDERSON

Sworn to and subscribed before me
this the _5th_ day of December, 2022.

_Zoe Antigone McKenzie_
Notary Public

My Commission Expires: _10/03/26_



37